Filed 3/15/21  P. v. Gause CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LAMAR GAUSE,<br><br>    Defendant and Appellant. | D076908<br><br><br>(Super. Ct. No. SCD280060) |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted David Lamar Gause of two counts of resisting an executive officer (Pen. Code,[1] § 69).  The court granted Gause three years of formal probation with specified terms and conditions.

Gause appeals, contending the trial court erred in failing to sua sponte instruct the jury with the lesser included offense of simple assault.  We affirm.

FACTUAL BACKGROUND

Prosecution

On January 5, 2019, Gause, a 36-year-old man with a history of mental health issues, was staying at his sister's house in San Diego.  On that day, Gause became violent, shoving his sister, who has multiple sclerosis, to the ground, and getting into an altercation with his nephew.  Gause's family was concerned for him, felt that he was "beyond [their] control," and called the police so he could "get help."

Two uniformed police officers responded to Gause's sister's house.  The incident was captured on body-worn camera (BWC) video.  All the officers knew from dispatch was that they were responding to a "fight" where "a family member had pushed down his sister who was recently diagnosed with multiple sclerosis" and that the situation may involve "a mental health issue."  When the two officers arrived, Gause's family met them at the door, invited them into the house, and led them to Gause, who was in the garage.  Before the officers got to the garage, they could already hear Gause yelling, and Gause's family warned the officers that Gause was going to "flip out" when he saw them.

When the officers first saw Gause, he was immediately "very angry," "very aggressive," began "yelling" at the officers, and "balled up his fists" as if

---

[1]     Statutory references are to the Penal Code unless otherwise specified.

he were "ready to fight."  The officers tried to calm Gause down.  Gause's family also tried calming him down, urging him to just come inside and talk with the officers.  Gause refused, yelling out:  "What the fuck do I need to talk to them about."

As soon as the officers entered the garage, Gause approached them in an aggressive manner.  Due to Gause's angry, agitated state, the officers felt the need to detain him in handcuffs and pat him down for weapons to ensure everyone's safety.  But as soon as one of the officers reached for Gause, Gause responded by shoving him in the chest, throwing him backward into the other officer.  One of the officers pointed his Taser at Gause and repeatedly ordered him to turn around, but Gause refused and continued arguing with the officers, yelling that they would "have to kill" him, and that he was "going to fucking fight" them.  Gause, who was "much larger" than the officers, was raising his voice louder and louder, and continued "clenching his fists."

As Gause was arguing with the officers, he reached into his pocket, pulled out a knife, and flicked the blade open. One of the officers drew his gun, pointed it at Gause, and commanded him to "drop the knife" and "get on the ground."  As Gause continued yelling at the officers, raising his voice even more, he set the knife down on the table next to him and started digging through his pockets again.  The officers twice tried to deploy their Tasers on Gause, but they were not effective.  Gause was wearing several layers of baggy clothes, and he ripped the Taser barbs out of his clothes.

The officers' unsuccessful efforts to tase Gause seemed to anger him even more, causing him to attack both officers.  The fight lasted several minutes, during which Gause was able to knock the officers to the ground, put one of the officers in a headlock multiple times, and strike one of the officers in the side of the head.  Gause continued to fight with and overpower

3

the two officers, who were unable to take control of him. The two officers struggled with Gause until "finally more officers arrived" and they were able to take Gause into custody. Gause injured both officers during the fight, causing them pain, headaches, bruising, and abrasions.

Defense

Gause testified in his own defense. He said, on January 5, 2019, he went to sleep after working out in the garage of his sister's house. When he woke up, he found that his things were on the floor. As an uncle, he approached his nephew to find out "[w]hat was going on." He told his nephew that he needed to respect his elders. The two then began to wrestle.

Gause's sister came in to see what was going on and said, "You need to stop," so Gause and his nephew stopped wrestling. Then Gause's sister told him to get his things together. Gause packed up his stuff and waited for his other sister, L.K., to arrive and take him to her house.

When the officers arrived and came into the garage, they said they wanted to talk to Gause, but they already had their Tasers out and tried to grab him.[2] Gause's mother told Gause to talk to the police, so Gause walked toward the officers. Gause believed he was complying with the officers' requests to talk to them when he walked toward one of the officers, but that officer tried to grab Gause instead. Not understanding why the officer tried to grab his arms, Gause pulled his hands back and tried to figure out why the officer was grabbing at him. He testified that he did not "push at" the officer.

Gause testified that the officers never told him why they were there; they just kept saying they wanted to talk to him. When one of the officers

---

[2]    On cross-examination, when the prosecutor confronted Gause with the video of the incident, Gause admitted that the officers did not have their Tasers pointed at him when they first came into the garage.

4

asked what he had in his pocket, Gause went into his pocket and began emptying his pockets. Then, the officers tasered Gause for holding up the knife, but Gause was only trying to establish that he had a legal knife in his pocket.

Gause testified that the officer had him in a crane choke hold. A crane choke hold is when an officer places his or her knee on a detainee's back. Meanwhile, the other officer continued to tase Gause, who said he was having trouble breathing.

Gause denied wrapping his arm around the officer's neck, explaining that he was simply trying to hold the officer's body up because the officer was putting his entire weight into the side of Gause's knee. Gause also testified that "[i]f [the police] would [have] explain[ed] what they was doing, I would let them do their job."

L.K. also testified in Gause's defense. On January 5, 2019, after arriving at her sister's house, L.K. called a number that her mother had given her. She thought she was calling PERT,[3] and she asked for assistance because the family felt that Gause's mental health was deteriorating, and the three women (his mom and two sisters) could not handle his mental health issues because Gause was not aware of his mental health issues.

When the police arrived and L.K. learned there were no PERT personnel available, she was disappointed. She "wanted someone certified to help" her brother, "not the police to come and . . . just trot him off."

## DISCUSSION

Gause contends the trial court committed reversible error by failing to sua sponte instruct the jury on the lesser included offense of simple assault.

[3]     PERT is the Psychiatric Emergency Response Team in San Diego County.

5

The People concede that assault can be a lesser included offense of resisting an executive officer under the accusatory pleading test, but maintain that the trial court had no duty to provide that instruction because it was not supported by substantial evidence.  We agree.

We review whether a trial court improperly failed to instruct on a lesser included offense de novo.  (*People v. Souza* (2012) 54 Cal.4th 90, 113; *People v. Brown* (2016) 245 Cal.App.4th 140, 152 (*Brown*).)  A court is obligated to instruct the jury on a lesser included offense only if there is substantial evidence supporting it.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154, 162 (*Breverman*).)  Substantial evidence is " ' "evidence that a reasonable jury could find persuasive" ' [citation], which, if accepted, ' "would absolve [the] defendant from guilt of the greater offense" [citation] but not the lesser.' "  (*People v. Cole* (2004) 33 Cal.4th 1158, 1218; see *Breverman*, at p. 162.)  We do not evaluate the credibility of witnesses, and we resolve doubts in favor of giving the instruction.  (*Breverman*, at pp. 154, 162; see *People v. Strozier* (1993) 20 Cal.App.4th 55, 63.)  Yet, in conducting our review, we do not merely credit the defendant's testimony; instead, we evaluate whether such testimony is " ' "evidence from which a jury composed of reasonable [people] could . . . conclude" ' " that the lesser offense, not the greater, was committed.  (*People v. Cruz* (2008) 44 Cal.4th 636, 664.)  When the evidence in support of the lesser included offense is " 'minimal and insubstantial,' " the lesser included offense instruction does not need to be given.  (*People v. Barton* (1995) 12 Cal.4th 186, 201.)

A defendant violates section 69 when he or she attempts to deter the officer's lawful duty by threatening force or violence.  (*Brown*, *supra*, 245 Cal.App.4th at p. 151, citing *People v. Smith* (2013) 57 Cal.4th 232, 240.)  A

6

defendant also violates section 69 by knowingly resisting an officer's lawful duty by using force or violence against the officer.  (*Brown*, at p. 151.)

"[A]ssault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  (§ 240.)  It does not require specific intent to cause injury or subjective awareness of the risk that injury might occur.  (*People v. Williams* (2001) 26 Cal.4th 779, 790.)  It "requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another."  (*Ibid*.)

Here, Gause cites *Brown* for the proposition that simple assault is a lesser included offense to a section 69 violation under the accusatory pleading test.  Under this test, a court considers "whether the facts in the accusatory pleading include all the statutory elements of assault."  (*Brown, supra*, 245 Cal.App.4th at p. 153, citing *People v. Birks* (1998) 19 Cal.4th 108, 117-118.)  If they do and it is not possible to violate the statute without committing assault, assault is a lesser included offense of section 69.  (*Brown*, at pp. 152-153.)  The People concede that, here, simple assault is a lesser included offense of resisting an executive officer on the accusatory pleading test.  We agree with the parties.

In the instant matter, the charging document alleged that Gause "did unlawfully attempt by means of threats and violence to deter and prevent . . . an executive officer from performing a duty imposed upon such officer by law, and did knowingly resist by use of force and violence said executive officer in the performance of his/her duty . . ."  Thus, as charged, Gause was alleged to have resisted the executive officer by actually using force and violence (as opposed to just threats).  Accordingly, under the

7

accusatory pleadings test, simple assault could be a lesser included offense of resisting an executive officer. (See *Brown*, *supra*, 245 Cal.App.4th at p. 153.)

Gause argues there existed substantial evidence to support the giving of an instruction for simple assault. Anticipating that the People would argue that Gause's argument lacks merit because there was no evidence that he committed anything less than a violation of section 69, Gause urges this court to reject any such argument and follow *Brown*, *supra*, 245 Cal.App.4th 140. That case does not help Gause under the unique facts of the instant matter.

In *Brown*, the defendant had been riding a bicycle on the sidewalk in violation of the local municipal code, and he had been wearing headphones and riding the bicycle without a light in violation of the Vehicle Code. (*Brown*, *supra*, 245 Cal.App.4th at p. 146.) Officers pursued the defendant on foot and caught up to him in a parking lot. (*Ibid*.)

Officers testified that the defendant refused to dismount his bicycle or stop, so one officer tackled him and threw him off the bicycle, taking him to the ground. (*Brown*, *supra*, 245 Cal.App.4th at p. 146.) Then the defendant swung his hands with a clenched fist, and an officer used a fist to hit the defendant in the torso, after which the defendant continued to swing, so a second officer "delivered three 'compliance strikes,' " one to his torso and two to the side of the defendant's head, after seeing the defendant reach for something in his waistband. (*Id*. at pp. 146-147.) In contrast, the defendant testified that he fell off his bicycle when he hit a curb, and while he was facedown, neither resisting nor fleeing, one of the officers dove onto his back and pinned him, then slugged him in the head three times. (*Id*. at p. 147.) Central to the defendant's case was the theory that officers did not act

8

lawfully because they used unreasonable and excessive force. (*Id.* at pp. 150, 154-155.)

The court of appeal explained that "the jury was not required to choose and fully credit only one of the two versions . . . ." (*Brown*, *supra*, 245 Cal.App.4th at p. 154.) Jurors could have accepted Brown's testimony that officers unreasonably began the physical violence by tackling him after he fell from his bike, but also thought that Brown later used excessive force and violence in resisting the officers. Because the jury could find that Brown unreasonably struck the officers *after* the officers acted with excessive force, there was substantial evidence to support a simple assault conviction. (*Ibid.*)

For the jury here to find Gause guilty of assault but not guilty of resisting an executive officer (see *Breverman*, *supra*, 19 Cal.4th at p. 162), it would have had to conclude that the police officers used unreasonable or excessive force and were therefore not engaged in the lawful practice of their duties at the time. (See *Brown*, *supra*, 245 Cal.App.4th at pp. 154-155.) The jury would also have needed to conclude Gause responded to the officers' use of excessive force with excessive force of his own; otherwise, had he merely resisted with reasonable force, he would not have been guilty of any crime at all. (See *ibid.*) In other words, in the context of this case, unless there was substantial evidence that the police officers initiated the physical violence by employing unreasonable or excessive force, the failure to offer the instruction for assault was not erroneous.

While the jury in *Brown* could have concluded the police and the defendant acted with excessive force based on the evidence, this case is factually distinguishable. First, the circumstances surrounding the police detention in the instant matter were markedly different from that of *Brown*. In *Brown*, the defendant was a 67-year-old man who was about five feet eight

9

inches and weighed 140 pounds, while the officers were six feet tall and weighed 175 pounds and 200 pounds. (*Brown*, *supra*, 245 Cal.App.4th at p. 146.) Here, Gause was "much larger" than the officers, and in fact, bested the officers during their physical confrontation to such an extent that additional officers had to arrive to help subdue Gause. Second, the police in *Brown* stopped the defendant for vehicle and municipal code violations, nonviolent offenses. (*Ibid*.) Here, officers responded to a report of a "fight" where "a family member had pushed down his sister who was recently diagnosed with multiple sclerosis" and that the situation may involve "a mental health issue." When the officers arrived, Gause was acting angry and aggressive. His fists were balled up like he was ready to fight. He yelled at the officers. Thus, the potential danger for officers here was heightened more than what the officers faced in *Brown*.

Unlike in *Brown*, here, there was insufficient evidence to support an instruction of simple assault. It is an appellant's burden to demonstrate error. (*People v. Garza* (2005) 35 Cal.4th 866, 881.) Moreover, it is an appellant's duty to support arguments in his or her briefs by references to the record on appeal, including citations to specific pages in the record. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.) Gause appears to offer two theories as to how the jury could find that Gause used excessive force "only after [one of the officers] acted unreasonably." He first critiques how the officers chose to initiate contact, claiming the jury "could reasonably have accepted defense counsel's suggestion that officers did ***not*** need to enter the garage immediately." In a similar vein, he suggests the officers should have asked Gause to come outside the garage to answer some questions and responded to his question as to why they were there. But whether these would have been good or bad tactical choices for defusing a

10

tense situation, they provide no basis for finding that the officers were first to employ excessive or unreasonable force, a necessary predicate to the *Brown* rationale.

More to the point, Gause argues that the first officer to enter the garage used unreasonable force when he grabbed Gause's arm without first telling him that he needed to pat him down for weapons. But as the BWC video makes clear, the officer was not simply initiating the use of the minimal force necessary to conduct a pat-down search; he was also responding to Gause, who turned and approached the officers yelling, with fists clenched in an aggressive manner. Making a split-second decision, the officer reasonably concluded he needed to grab defendant's arms to control the situation. This is quite different from the circumstances in *Brown*, where the defendant testified to what the officers allegedly did to him after he fell off his bike— diving on his back, pinning him down, and hitting him in the head three times. (See *Brown*, *supra*, 245 Cal.App.4th at p. 147.) These critical factual differences indicate there was little evidence to support the giving of a simple assault instruction.

In addition to the officers' testimony about what occurred, both BWC videos were played for the jury. In the videos, Gause appears angry with his family for calling the police because he "did not put [his] hands on [his] sister." Thus, the video evidence established that Gause knew why the police were there: His family had called them because of an altercation he had with his sister. When the officers first arrived, they were exceedingly patient and calm with Gause and tried to defuse the situation. This is true even after Gause shoved one of the officers and yelled that he was going to fight them. When Gause pulled out a knife and continued to rummage through his pockets in contradiction to the officers' commands, the officers did not use

11

lethal force. Particularly in light of this evidence and the fact that Gause does not point to other evidence that supports his contention that a simple assault instruction must have been given, we determine the evidence does not support Gause's position that a reasonable jury could have convicted him only of the lesser offense.

Finally, even if the court erred by failing to offer the simple assault instruction sua sponte, the failure to do so would constitute harmless error. " ' "[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." [Citation.]' " (*Brown*, *supra*, 245 Cal.App.4th at p. 155.) We reverse a judgment based on failure to provide an instruction on a lesser included offense "only if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred. [Citation.]" (*Breverman*, *supra*, 19 Cal.4th at p. 178.)

Based on our review of the entire record, it is not reasonably probable Gause would have obtained a more favorable outcome had the jury been instructed with the lesser included offense of assault. To reach a verdict on assault, the jury would have had to determine that Gause used excessive force in response to the officers' use of excessive force (see *Brown*, *supra*, 245 Cal.App.4th at p. 154), a proposition for which, as explained *ante*, there was not substantial evidence.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

DATO, J.